**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**SHARL D. TYSON,**

      **Plaintiff,**

**vs.**                                    **Case No. 1:13cv223-MP/CAS**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).   It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's application for a period of disability and Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act).   After careful consideration of the record, it is recommended that the decision of the Commissioner be affirmed.

**I.   Procedural History**

On August 26, 2010, Plaintiff, Sharl D. Tyson, filed an application for a period of disability and DIB under Title II of the Act, alleging disability beginning November 23, 2009, due to "surgery on left shoulder; plate not removed . . . depression; anxiety."

R. 12, 17, 149-50, 183.   (Citations to the Record shall be by the symbol R. followed by a page number that appears in the lower right corner.)   The claim was denied initially on January 10, 2011, and upon reconsideration on May 13, 2011.   R. 17, 84-89.

On June 9, 2011, Plaintiff filed a timely written request for a hearing before an Administrative Law Judge (ALJ).   R. 17.   On May 7, 2012, ALJ Lisa B. Martin, held a hearing in Jacksonville, Florida.   Plaintiff and Donna P. Mancini, an impartial vocational expert, testified at the hearing.   R. 37-74, 115-16 (Resume).   Plaintiff was represented by Kiersten M. Gordon, an attorney.   R. 17, 37, 91-93, 147-48, 230-33.

On April 30, 2012, Plaintiff's counsel provided the ALJ with a pre-hearing memorandum.   R. 39-42, 230-33.   On July 26, 2012, the ALJ entered a partially favorable decision finding that Plaintiff was entitled to a closed period of disability from November 23, 2009, through April 4, 2011, but demonstrated medical improvement that enabled her to perform light work with restrictions and was not entitled to further disability benefits beginning April 5, 2011.   R. 17-31.   On September 13, 2012, Plaintiff requested the Appeals Council to review the ALJ's decision.   R. 10-11.   Plaintiff was represented by N. Albert Bacharach, Jr., an attorney.   *Id.*   On September 26, 2013, the Appeals Council denied Plaintiff's request for review making the ALJ's decision the final decision of the Commissioner.   *See* 20 C.F.R. § 404.981.   R. 1-3.   On November 6, 2013, Plaintiff filed a Complaint requesting judicial review of the Commissioner's final decision. Doc. 1.   Both parties filed memoranda of law, docs. 17 and 20, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

### A.   Closed Period of Disability

1.  "The claimant meets the insured status requirements of the Social Security Act through December 31, 2014."  R. 20.

2.  "The claimant has not engaged in substantial gainful activity since November 23, 2009, the date the claimant became disabled."  *Id.*

3.  "From November 23, 2009, through April 4, 2011, the period during which the claimant was under a disability, the claimant had the following severe impairments: left upper extremity disorder status post left clavicle fracture, depression, anxiety, and a lumbar disorder."   R. 21

4.  "From November 23, 2009, through April 4, 2011, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1."  *Id.*

5.  "[F]rom November 23, 2009 through April 4, 2011, the claimant had the residual functional capacity [RFC] to perform light work as defined in 20 CFR 404.1567(b) except the claimant was limited to no ladder, rope, or scaffold climbing.   The claimant was limited to no crawling, no reaching tasks with the left upper extremity, and no lifting and carrying with the left upper extremity.   The claimant needed to avoid dangerous work hazards.   She was limited to routine, uncomplicated tasks at a non-assembly/fast pace.   The claimant was off task as much as 1/3 of the workday due to distracting pain symptoms."  R. 22.

6.  "From November 23, 2009, through April 4, 2011, the claimant was unable to perform any past relevant work."  R. 24.   "The claimant was a younger individual age 18-49, on the established onset date."  *Id.*   From November 23, 2009 through April 4, 2011, considering the claimant's age, education, work experience, and [RFC], there were no jobs that existed in significant numbers in the national economy that the claimant could have performed."  *Id.*

7.  "The claimant was under a disability, as defined by the Social Security Act, from November 23, 2009, through April 4, 2011."  R. 25.

### B.   Period of No Disability

8.  "The claimant has not developed any new impairment or impairments since April 5, 2011, the date the claimant's disability ended.   Thus, the claimant's

current severe impairments are the same as that present from November 23, 2009, through April 4, 2011." *Id.*

9.   "Medical improvement occurred as of April 5, 2011, the date the claimant's disability ended."   R. 27.   "The medical improvement that has occurred is related to the ability to work because there has been an increase in the claimant's [RFC]." *Id.*

10.   "[B]eginning April 5, 2011, the claimant has had the [RFC] to perform light work as defined in 20 CFR 404.1567(b) except the claimant is limited to no ladder, rope, or scaffold climbing and no crawling.   The claimant is limited to occasional reaching tasks (overhead and forward) with the left upper extremity.   The claimant has a 10-pound lift and carry restriction with the left upper extremity.   The claimant must avoid dangerous work hazards (unprotected heights and exposed machinery).   Due to pain limitations and mental health issues, the claimant is limited routine, uncomplicated tasks at a non assembly/ non fast pace."   *Id.*

11.   The claimant was a younger individual age 18-49, on the established disability onset date of November 23, 2009, and as of April 5, 2011.   R. 24, 30. The claimant has at least a high school education and is able to communicate in English.   *Id.*

12.   "Beginning April 5, 2011, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is not disabled, whether or not the claimant has transferable job skills."   R. 30.

13.   "Beginning April 5, 2011, considering the claimant's age, education, work experience, and [RFC], there have been jobs that exist in significant numbers in the national economy that the claimant can perform."   *Id.*

14.   "The claimant's disability ended April 5, 2011."   R. 31.

## III.   Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986).   "Substantial

evidence is more than a scintilla, but less than a preponderance.   It is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[1]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'"  Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

_____

[1]  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.   A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

months."   42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).

Both the "impairment" and the "inability" must be expected to last not less than 12 months.

Barnhart v. Walton, 535 U.S. 212 (2002).   In addition, an individual is entitled to DIB if

she is under a disability prior to the expiration of her insured status.   *See* 42 U.S.C. §

423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human

Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human

Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.   20 C.F.R.

§ 404.1520(a)(4)(i)-(v).

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal
        those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have the RFC to perform work despite limitations
        and are there any impairments which prevent past relevant work?[2]

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the

application for benefits.   A positive finding at step three results in approval of the

application for benefits.   At step four, the claimant bears the burden of establishing a

---

[2]   A residual functional capacity (RFC) is the most a claimant can still do despite
limitations.   20 C.F.R. § 404.1545(a)(1).   It is an assessment based upon all of the
relevant evidence including the claimant's description of her limitations, observations by
treating and examining physicians or other persons, and medical records. *Id.*   The
responsibility for determining claimant's RFC lies with the ALJ.   20 C.F.R.
§ 404.1546(c).

severe impairment that precludes the performance of past relevant work.   Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.   If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.   Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R.
§ 404.1520(a)(4)(v), (e) & (g).   If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

     If the claimant is found disabled any point in the process, it must be determined if the disability continues through the date of the ALJ's decision.   In order to find that the claimant's disability does not continue to the date of the decision, it must be determined that medical improvement has occurred which is related to the claimant's ability to work, or that an exception applies.   20 C.F.R. § 404.1594(a).   In most cases, it must be shown that the claimant is currently able to engage in substantial gainful activity.   *Id.*   In making this determination, an additional eight-step evaluation process for DIB claims must be undertaken.   *Id.*   In steps one through three, the ALJ must determine whether the claimant is engaged in substantial gainful activity, whether the claimant has an impairment or combination of impairments which medically meets or medically equals the

severity of a listed impairment, and whether medical improvement has occurred.   20

C.F.R. § 404.1594(f)(1)-(3).   Generally, the Commissioner must determine if there has

been any medical improvement in the person's impairments and, if so, whether the

medical improvement is related the person's ability to work.   20 C.F.R. § 404.1594(c)

and (f)(4) (discussing Commissioner's determination of medical improvement and its

relationship to claimant's abilities to do work).   Medical improvement is any decrease in

the medical severity of a claimant's impairment(s) that was present at the most recent

finding of disability.   20 C.F.R. § 404.1594(b)(1).   "[T]here can be no termination of

benefits unless there is substantial evidence of improvement to the point of no disability."

McAulay v. Heckler, 749 F.2d 1500 (11th Cir. 1985) (per curiam).   In making such a

determination, a "comparison of the original medical evidence and the new medical

evidence is necessary to make a finding of improvement."   *Id.* (*citing* Vaughn v. Heckler,

727 F.2d 1040, 1043 (11th Cir.1984)); *see* Simone v. Comm'r of Soc. Sec. Admin., 465 F.

App'x 905, 909 (11th Cir. 2012); (unpublished); Parrish v. Comm'r Soc. Sec. Admin., 334

F. App'x 200, 201 (11th Cir. 2009) (unpublished).   If the medical improvement has

occurred, the analysis proceeds to the fourth step for the DIB claim.   If not, the analysis

proceeds to the fifth step.

At step five, it must be determined if an exception to medical improvement applies.

20 C.F.R § 404.1594(f)(5).   There are two groups of exceptions that may apply.   20

C.F.R. § 404.1594(d) & (e).   If one of the first group of exceptions applies, the analysis

proceeds to the next step, but if one of the second group exception applies, the claimant's

disability ends.   If none apply, the claimant's disability continues.

At steps six through eight, it must be determined whether all the claimant's current impairments in combination are severe, the claimant's RFC must be assessed based on the current impairments to determine if the claimant can perform her past relevant work, and finally it must be determined whether other work exists that the claimant can perform, given the RFC and considering the claimant's age, education, and past work experience. 20 C.F.R. § 404.1594(f)(6)-(8).   If the claimant can perform other work, the claimant is no longer disabled.   If the claimant cannot perform other work, the claimant's disability continues.   20 C.F.R. § 404.1594(f)(8).

**IV.  Evidence**

**A.  Medical Evidence before April 5, 2011**

On November 24, 2009, the day after she was involved in a motor vehicle accident, Plaintiff sought treatment at Shands Hospital at the University of Florida. R. 240.   An x-ray of Plaintiff's shoulder showed a fracture of her left clavicle.   R. 245; *see* R. 23.   A chest x-ray showed a stable, small left-sided pneumothorax.   R. 245. Plaintiff was discharged on November 25, 2009, and advised to keep her left arm in a sling for two to four weeks as needed for comfort, to do shoulder range of motion (ROM) exercises three times a day to prevent stiffness, to not overexert herself with physical activity for two to four weeks, and to return to her local emergency room if she experienced any chest pain or shortness of breath.   R. 247.   She was instructed to stay active and to move around frequently.   R. 247-48

On December 1, 2009, Plaintiff sought follow-up treatment at Shands at the
University of Florida Clinic from her internist Ying Lu Nagoshi, M.D.   *Id.*   Plaintiff
reported that she had run out of the medication prescribed by the emergency room.
R. 278.   Plaintiff was prescribed Percocet and referred to an orthopedist to determine her
date of possible return to work.   R. 279.

On January 12, 2010, Plaintiff sought an evaluation at the Orthopedic Clinic of
University of Florida.   Raymund Woo, M.D., noted that an x-ray showed a non-healed
fracture and recommended operative intervention and insertion of a plate and screws.
Dr. Woo prescribed Lortab with one refill.   R. 499.   On February 23, 2010, Paul C. Dell,
M. D., performed the surgery.   R. 255, 418; *see* R. 23.   Dr. Dell inserted a synthetic plate
and advised Plaintiff to keep her arm in a sling and return in two weeks.   R. 255-56.

On April 20, 2010, Plaintiff visited internist Ying Lu Nagoshi, M.D., for a follow-up
and an annual examination.   R. 275.   Plaintiff requested that she resume her acid reflux
medication.   She reported that she had experienced increased feelings of lack of
motivation, listlessness, and tearfulness, and that Wellbutrin and Zoloft had not been
helpful.   *Id.*   Dr. Nagoshi prescribed Protonix for reflux, Celexa for depression, and
Claritin to decrease nasal congestion and advised Plaintiff to decrease her caffeine
intake.   R. 276.

In May 2010, Dr. Dell noted that Plaintiff was doing well ten weeks after surgery
and noted that she had no pain in her shoulder.   R. 496, 517; *see* R. 23.   Dr. Dell
referred Plaintiff for physical therapy and asked her to return in six to eight weeks to have
her hardware removed.   R. 495, 517.

On June 28, 2010, Dr. Dell noted that Plaintiff had improved with physical therapy (working on ROM) and was now able to comb her hair.   R. 494.   Dr. Dell indicated that Plaintiff was a candidate for plate removal and for scheduling the pre-operative appointment.   *Id.*; *see* R. 23.

On August 11, 2010, Plaintiff returned complaining of numbness of her legs, which she attributed to sciatic pain over her right buttock.   R. 263.   She reported that she had stopped taking Celexa abruptly two weeks earlier.   R. 266.   Plaintiff said she was able to walk long distances without any pain or numbness of her legs; she denied any pain in the joints of her hips or knees; and she denied any trauma to her back, hips, or legs.   R. 265-66.   Plaintiff's physical examination was within normal limits.   R. 266.   Examining physicians thought that the numbness was due to possible Celexa withdrawal and advised her not to abruptly stop it again.   *Id.*

During the early fall of 2010, Plaintiff returned to Dr. Nagoshi who prescribed several medications including Oxycodone, Lortab, LIdex, Protonix, Celexa, Prempro, and Flonase.   *See, e.g.*, R. 261, 264.   After another visit, Dr. Nagoshi noted that Plaintiff's reflux symptoms were well-controlled; Prilosec and Prempro were discontinued.   R. 261-62.   Dr. Nagoshi noted that Celexa helped Plaintiff's depression and anxiety and that she was still seeing a pain management physician for her MVA-related to pain.   R. 262.

On October 13, 2010, Plaintiff sought treatment at the emergency room--she had been walking, slipped and fell down five steps at home.   R. 302.   She complained of left-sided and central chest pain similar to what she experienced with anxiety and stated

that she had not taken her Xanax for two days because she misplaced it.   *Id.*   A CT scan of the lumbar spine was negative for herniated disc or vertebral fracture.   R. 303-04, 312. She was diagnosed with a probable lumbar strain and contusion and given a prescription for Robaxin and Naproxen.   Xanax was re-filled.   Plaintiff had no motor weakness or sensory deficit.   R. 303-04.

On November 10, 2010, Janet K. Humphreys, Ph.D., performed a psychological consultation at the request of the state agency (to rule out disabling psychological condition).   R. 325-27; *see* R. 21-22 (ALJ's findings).   Dr. Humphreys noted Plaintiff's complaints of depressed and anxious mood.   R. 326.   Dr. Humphreys described Plaintiff's thought process and content of thought as tangential, with no peculiar or bizarre content.   R. 325-26.   Dr. Humphreys stated that no peculiarity of gait or involuntary movement were noted.   *Id.*   She was well-oriented to person, time, and place.   Plaintiff demonstrated good judgment and insight for hypothetical questions.   On a test of memory, Plaintiff was able to repeat five digits forwards and backwards.   *Id.*   She was able to recall two of three objects after about five minutes and recall the third with a clue. R. 326-27.   Her remote memory appeared to be intact.   R. 327.   Plaintiff reported that she had never been hospitalized for any psychiatric problems. R. 325.

Based on Plaintiff's complaint of mood changes from happy to sad, anxiety, panic attacks, difficulty sleeping, racing thoughts, and irritability, Dr. Humphreys offered a primary diagnostic impression of symptoms consistent with Bipolar I Disorder and Anxiety disorder, NOS.   R. 327.   "Her mood and anxiety likely impact her perception of pain."

*Id.*   Dr. Humphreys indicated that Plaintiff may benefit from a pharmacological re-evaluation and psychotherapy.   *Id.*   Dr. Humphreys thought that Plaintiff's concentration and memory appeared mildly impaired and may impact her ability to carry out complex instructions; her social skills and judgment may be affected by her mood and anxiety.   *Id.*

On December 22, 2010, Plaintiff underwent a biopsy of her right and left breasts that did not indicate any tumor.   R. 399, 402.   The pathology report identified no invasive carcinoma.   R. 425.   Plaintiff complained of a post-surgical discharge, but was informed that this was part of the post-surgical healing process.   R. 460.

On February 8, 2011, Dr. Dell removed the plate and screws from Plaintiff's left clavicle.   R. 423; *see* R. 23.

On February 14, 2011, Plaintiff saw Dr. Nagoshi for follow-up and complaints of breast pain and hot flashes.   R. 480.   Dr. Nagoshi noted that a pain management physician from Tampa was prescribed Lortab and Oxycodone.   R. 481.   Plaintiff reported that her legal issues were finally resolved; she would not have to go to jail.   *Id.* Dr. Nagoshi recommended that Plaintiff continue taking Omeprazole (Prilosec) for her gastroesophageal reflux disease that she discuss her complaints of insomnia during her evaluation by a psychiatrist.   R. 482.   Plaintiff's physical exam was normal.   R. 481.

On February 21, 2011, Plaintiff returned to Dr. Dell for a post-operative visit and suture removal.   R. 492.   Plaintiff was referred for her back pain.   It is reported that Plaintiff had a history of sciatica and some chronic back and neck pain which Plaintiff

wanted evaluated.   An x-ray on February 21, 2011, ordered by Dr. Dell after he removed the hardware, showed no acute fracture and no pneumothorax.   R. 507.[3]

### B. Medical Evidence after April 5, 2011[4]

On April 4, 2011, Plaintiff returned to the orthopaedic clinic at the University of Florida for follow-up after her hardware was removed.   R. 491.   Plaintiff reported that she was doing "much, much, better."   *Id.*   She said that she had developed some periscapular and shoulder muscle pain.   *Id.*   On examination, Dr. Dell found no tenderness to palpation along the clavicle, some tenderness about the deltoid, and no motor or sensory deficits.   Plaintiff had "made some progress with her pain," and would continue seeing pain management "for her neck and low back problems."   Plaintiff's scar looked great.   *Id.*   Dr. Dell prescribed physical therapy exercises for left shoulder ROM strengthening exercises.   *Id.*   The ALJ accorded great weight to Dr. Dell's opinion.   R. 24.

---

[3]   The ALJ found that Plaintiff "required an extensive period of recovery from her motor vehicle accident.   During recovery, the claimant was unable to reach, lift and/or carry with the left upper extremity; the claimant was limited to non-weight bearing of the left upper extremity (Exhibit 16F/17).   What is more, the record indicates that the claimant was off task as much as 1/3 of the workday due to distracting pain symptoms." R. 23-24.

[4]   The ALJ determined that Plaintiff's medical condition changed and improved after April 5, 2011.   R. 25-30.   The ALJ determined that Plaintiff had mild restriction in activities of daily living and social functioning; moderate difficulties regarding concentration, persistence or pace; and no episodes of decompensation which have been for an extended duration.   R. 26.   Plaintiff's RFC increased such that the ALJ determined that Plaintiff could perform light work with exceptions.   R. 27.   Although Plaintiff was still unable to perform past relevant work, the ALJ found that she could perform other work in the national economy, a determination not adequately rebutted by Plaintiff.   R. 30-31.

On April 14, 2011, upon Dr. Nagoshi's referral, Mariam Rahmani, M.D., performed

an initial psychiatric examination of Plaintiff.   R. 560-64.   Dr. Rahmani diagnosed major

depressive disorder, moderate recurrent, and anxiety disorder, NOS. R. 564.   Dr.

Rahmani assigned a Global Assessment of Functioning (GAF) score of 60, indicating

moderate symptoms.[5]   Id.   Dr. Rahmani prescribed Abilify for anxiety.   Id.   Plaintiff

scored 36 on the Beck Anxiety Inventory which indicated moderate-to-severe anxiety;

she scored 17 on the Beck Depression Inventory which indicates mild depression.   Id.

During the clinical interview, Plaintiff told Dr. Rahmani that she had spent a few

months in jail for a conviction of possession and trafficking in stolen property and had

---

[5]   The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000) includes the GAF Scale that is primarily used by mental health practitioners.   The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure."   *See* DSM-IV-TR 32-34.   The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale.   *Id.*   *See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing the GAF scale).   A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.   *Id.*   The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"   Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).   In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (5th ed. 2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice. In order to provide a global measure of disability, the WHO Disability Assessment Schedule (WHODAS) is included, for further study, in Section III of DSM-5 (see the chapter "Assessment Measures")."   DSM-5 at 16; *see* Finley v. Colvin, Civil Action No. 3:12-7908, 2013 WL 6384355, at *23 n.9 (S.D. W.Va. Dec. 5, 2013) ("It should be noted that in the latest edition of the [DSM], the GAF scale was abandoned as a measurement tool.").

been on house arrest after spending a few months in jail.   She was concerned that she

may have to serve additional jail time for violation of her probation.   R. 560-64.

Plaintiff's thought process was linear, logical, and goal-directed.   R. 563.   She had no

suicidal or homicidal ideation or auditory or visual hallucinations, although she did

endorse some paranoid thoughts.   *Id.*   Plaintiff said that she received a check of $1,040

a month from Worker's Compensation.   *Id.*   She said that she attended church every

week.   Her language, cognition, recent and remote memory, concentration, and

attention span were grossly intact, and her mood was "okay."   *Id.*   She appeared

anxious and guarded.   *Id.*   Her insight, reliability, and judgment were fair.   *Id.*

When Plaintiff returned on May 18, 2011, Dr. Rahmani noted that Plaintiff did not

like the Abilify because of hair loss and insomnia.   R. 557.   Plaintiff reported that she

would remain under house arrest until June 13, 2011, and wanted to return to work after

that--"maybe light-duty part-time, but [her] doctor will have to clear [her].   She will work at

the Jobs Corps."   *Id.*   Dr. Rahmani noted that Plaintiff's appearance was neat and

casual; her behavior was cooperative, and her eye contact was good; Plaintiff walked

without difficulty; her speech was normal; thought process was well organized; thought

content did not demonstrate any psychotic symptoms; her attention and concentration

were adequate; she had no homicidal ideation; and her memory was intact.   R. 558.

Dr. Rahmani continued Plaintiff on Celexa for depression and anxiety and discontinued

Abilify, and continued Plaintiff on Seroquel daily for sleep, paranoia, and augmentation of

antidepressant.   R. 556.   Her GAF score was 60.   Plaintiff reported attending physical

therapy four times a week.   R. 557.

On June 17, 2011, Dr. Rahmani noted that Plaintiff's anxiety and sleep improved on Seroquel.   R. 554.   Plaintiff told Dr. Rahmani she was happy and relieved that she was no longer under house arrest and that she planned on exercising and meeting with her old friends.   She also planned to return to her job at the Job Corps in two to three months.   *Id.*   Plaintiff denied any problems with concentration and anxiety.   She denied tearfulness and suicidal ideation.   *Id.*   Dr. Rahmani noted that Plaintiff reported her mood as "very good," and she ambulated without difficulties.   Her judgment and insight were fair.   Overall, her mental status exam was uneventful.   R. 555.

On August 2, 2011, Jessica M. Prowell, M.D., a resident who examined Plaintiff under the supervision of attending physician Dr. Hodgin, observed that Plaintiff complained of being irritable and not wanting to be around other people.   R. 551-52.   Dr. Prowell noted that Plaintiff's thought process was coherent, well-organized, linear, and logical, and that she denied any psychotic symptoms.   Dr. Prowell increased Plaintiff's Seroquel to 25mg, continued Celexa, and noted that Plaintiff had requested therapy for anxiety.   Plaintiff's GAF score was 60.   R. 552.

On September 13, 2011, when Plaintiff requested Xanax for her symptoms of anxiety, Dr. Prowell increased Plaintiff's Seroquel to 50mg and declined to prescribed "benzo's" while Plaintiff was taking medication for pain management.   R. 550. Dr. Prowell referred Plaintiff for psychological therapy for anxiety and noted she would benefit from supportive therapy.   *Id.*   Plaintiff's GAF score was 60.   *Id.*

On October 12, 2011, Dr. Nagoshi noted that Plaintiff "said hot flash is better" and that "[s]he is following psych for depression and anxiety and it has been well controlled."

R. 532.   Plaintiff's physical exam was normal and, in particular, it was noted that she was

in no apparent distress; her ROM was normal and she had no joint swelling or

tenderness; she was alert and oriented to person, place, and time and her reflexes were

normal; she had normal muscle tone and sensation and her coordination was normal; her

mood, affect and behavior were normal.   R. 533.

On October 27, 2011, Plaintiff reported to Dr. Prowell that her mood had been "ok,

anxious."   R. 546.   Plaintiff was neat and well groomed, her eye contact was good, and

she was cooperative.   *Id.*   Plaintiffs thought process was coherent and logical.   She

complained of some increased anxiety and endorsed paranoid thoughts.   *Id.*   Dr.

Prowell prescribed Trazodone for anxiety and again referred Plaintiff for psychological

therapy.   R. 547.   Plaintiff's GAF score was 60.   *Id.*

On November 22, 2011, Plaintiff told Dr. Prowell that her mood had been

depressed since her disability payments stopped.   R. 542-43.   She felt "like 'giving up,'

'what's the point.'"   R. 542.   She denied suicidal ideation.   *Id.*   Plaintiff reported that

her sleep was better at night and that her anxiety was better during the day since the

change to Trazodone.   *Id.*   Dr. Prowell noted that Plaintiff's affect was appropriate and

that she was engaged, interactive, and euthymic.   R. 543.   Dr. Prowell continued

Plaintiff on Trazodone, Seroquel, and Celexa, and noted that Plaintiff had not yet

arranged for psychological therapy.   It is reported that Plaintiff had a hard time getting an

appointment with Shands psychology.   R. 544; *see* R. 234 (medication list).

On December 27, 2011, Plaintiff presented with her mother to her appointment

with Dr. Prowell.   R. 539.   Dr. Prowell noted that Plaintiff stated her mood is "'ok,' not

depressed, primarily enjoys eating and sleeping, denies SI." *Id*.   Plaintiff denied that her

morning dose of Trazodone made her sleepy, but reported that it helps her anxiety so that

she can rest.   *Id*.   Her anxiety is improved.   Plaintiff "[r]eports she is still not on disability

but did get a cash settlement and is thinking about moving back to her home town in

Cross City.   She states she does not feel that she has any problems, but reports her

mother thinks that she does not 'act right.'"   *Id*.   Plaintiff's "mother states [Plaintiff] is

quick to anger, will be rude to fast food service workers or bank teller, sleeps too much,

and folds her towels a particular way that her mother thinks is weird."   *Id*.   Plaintiff's

medications included Seroquel, Celexa, Flonase, Prilosec, and Lidex.   *Id*.

      Dr. Prowell also conducted a mental status examination.   R. 540.   Plaintiff's

appearance was neat, clean, well-groomed and casual; she had good eye contact and

was cooperative; her muscle strength and tone showed normal and without apparent

weakness or atrophy.   *Id*.   Her psychomotor activity was appropriate; ambulated without

difficulties; her rate of speech was normal, providing appropriate, and tone spontaneous.

Her thought process was coherent and logical.   Her associations were appropriate and

no looseness of associations or flight of ideas were identified.   Plaintiff denied auditory

and visual hallucinations although she did endorse paranoid thinking.   She expressed no

suicidality or homicidal ideation.   Her judgment was fair; insight superficial.   She was

oriented to person and situation; her remote and recent memory were grossly intact and

her attention/concentration was adequate.   Her language was fluent and she expressed

a fund of knowledge which was age appropriate.   Her mood was okay and affect was

appropriate, engaged, interactive, and euthymic.   *Id*.

Dr. Prowell's assessment was: "[t]his is a 45 y.o. AA female with a history of MDD, anxiety NOS, paranoid personality, and chronic pain currently on seroquel and celexa. Pt reports med compliance, no side effects, good efficacy.   Denies depression or significant anxiety.   No imminent dangerousness appreciated at this time.   Pt could benefit from counseling for coping skills for anxiety and social stressors."   R. 541. Dr. Prowell's diagnoses included major depressive disorder, moderate recurrent; anxiety disorder, NOS and to further evaluate for paranoid personality disorder.   Her GAF score was 59.   Plaintiff was continued on Trazodone, Seroquel, and Celexa.   Her next appointment was scheduled for six weeks.   *Id.*

On March 20, 2012, notes (although difficult to read) from the Gainesville Pain Center indicate Plaintiff reported that she had had a rough month and needed to take medications more than usual.   R. 522.   Her bilateral straight leg raise was positive; her lumbar spine ranges of motion were limited.   R. 523.   Her past medical history included depression, paranoia and chronic pain syndrome; her psychiatric history included depression, paranoia, and anxiety.   R. 522.   One note states that Plaintiff is unable to work due to severe limitation of her left arm.   R. 524; *see* R. 29 (ALJ reference).

### C. Plaintiff's Hearing Testimony

At the hearing, Plaintiff testified that she has an apartment, but resides with her daughter in another city in light of some security concerns.   R. 44-45.[6]   Plaintiff has no

---

[6]   Plaintiff indicated in the disability report that she was able to do household chores of cleaning, laundry, and ironing.   R. 192.   She said she went out daily, drove a car, and went shopping once a week.   R. 193.   She reported that she threw and caught a football with her grandchildren.   R. 194.   She also reported that she went to church and to Bible study and visited a friend regularly.   *Id.*; *see* R. 26.

income and was not working at the time of the hearing.   R. 44.   Her mother pays her

rent, light bills, and out-of-pocket medical bills; she receives food stamps.   R. 45-46.

Plaintiff is 46 years old and has a high school education.   R. 45.

In 2009, Plaintiff worked at the Gainesville Job Corps Center as a resident advisor

(without living on site) in a dorm assisting 28 to 32 females with their daily living and

making sure "they're doing the right thing," such "checking to make sure they're not trying

to sneak off campus." R. 47-48, 164, 174, 177 (2009 wages of $14,303.00 and 2010

wages of $6,512.64 at Del-Jen, Inc.).   (In a disability report, it is noted that Plaintiff

worked in this position from February 2009 through November 2009 making $10.23 an

hour.   R. 184.)   Plaintiff did some lifting, carrying, and restrained individuals as part of

her job.   R. 48.   Plaintiff had no reported wages in 2008.   R. 163, 174, 177.

Plaintiff testified she worked for Karlene's Tender Love and Care, Inc., (Karlene's)

in 2006 and 2007, a group home assisting ladies with their daily living and teaching them

skills.   She also had driving activities including picking the ladies up and driving them to

school.   R. 48.   Her wages from Karlene's were $7,410.11 in 2007 and $645.00 in 2006.

R. 163, 173, 177.   In 2006, Plaintiff also worked for the State of Florida as a human

services assistant taking care of the mentally retarded, teaching life skill activities such as

cooking.   R. 49.   Her wages were $20,004.27.   R. 163, 173, 177.   At times, she

physically restrained the individuals; she also had driving activities.   R. 50.   Plaintiff's

work history report indicates that she worked for the State of Florida from 1998 to 2007.

R. 177.

Plaintiff was involved in a motor vehicle accident on November 23, 2009, sustaining a fracture of the left collarbone.   R. 23.   She is right-handed.   R. 50. Plaintiff confirmed she had an extensive period of recovery.   She was initially put in a sling and then had surgery for internal hardware to help in the healing process.   *Id.* In February 2010, she had surgery to insert the plate in her shoulder and the hardware (plate) was removed a year later.   R. 50-51.   She testified she had pain while the hardware was inserted and that she could not lift her arm.   She can lift her arm now, "but not to the extent where [she] did before [she] had the surgery."   R. 51-52.   "The surgery helped because it brought the bone down, but it didn't stop the pain. . . . [She has steady] pain.   [Her] arm go[es] numb.   It goes all up [her] neck.   [She has] fractured ribs.   [She does not know if that's the reason [her] back, but it's just the right side.   [She has] –- pain. It wakes [her] up through the night."   The pain is primarily in her left shoulder area; "it goes numb" "[a]ll the time."   *Id.*   Plaintiff is currently pursuing pain management.   She had been going to an orthopedic clinic for the shoulder part of her problem but her insurance through Del-Jen stopped, she no longer has insurance.

R. 52.   Plaintiff testified that the primary reason why she stopped working was based on her left arm injury, but that "things got worse then."   R. 55.[7]

---

[7]   After her hardware was removed from her shoulder, Plaintiff had physical therapy at the orthopedic clinic for "a month or two.   Probably like -- 2011 --."   R. 65. (The orthopedic doctor recommended a 10-pound lifting restriction and referred her to therapy.   R. 64.)   The ALJ mentioned the "need to get updated orthopedic records just to make sure we're capturing everything."   R. 66.   At the outset of the hearing, counsel and the ALJ also referred to needed updated psychiatric records from the University of Florida.   R. 40-42.   Counsel advised that these are the records that were needed that she referred to earlier in the hearing.   R. 66.   The ALJ inquired whether Plaintiff was receiving medication from April 2011 to January 2012 and Plaintiff said "[y]es" and

She can grab and maybe wash a dish with her left arm but has to be careful not to drop it.   R. 53.   She can lift a dish up and down and overhead with her right arm.   She also stated that she can rotate and lift her left arm over her head.   R. 53.   She does not have problems with her right arm, only with her right hand that goes numb.   She stated that she "can pick up the pitcher and just drop it."   R. 54.   Plaintiff is taking pain medication including Oxycodone, muscle relaxers, and three mental medications.   *Id.*[8] She recalled being sent to an arthritis doctor by her primary doctor, Dr. Nagoshi, in 2005 or 2006.   She continued to perform the work activities described above after that time. R. 55.

Other than her problems with her left arm, Plaintiff also has pain in her back and right leg--"[a]ll down [her] back and [her] right leg, [her] feet."   R. 57.   Her pain medications have helped.   *Id.*   She has difficulty walking for long periods of time. R. 57-58.   She reiterated that she has difficulty "walking, standing, bending, getting up" and sometimes she will have to "lay down and wait for a minute and get things right and going."   R. 58.   Sometimes when asleep, the pain hits her in the back and she will wake up.   Sometimes her "right foot will just jump on its own."   *Id.*   She cannot walk far; she cannot stand.   She moves "around all the time in one spot.   [She] move[s] around all the time from this hip to this hip," constantly shifting positions when sitting.   *Id.*   She sleeps on two heating pads.   R. 59.   She can sit "good" for 30 to 45 minutes and "rotate from side to side," but then she needs to lay down for "[a]bout 30 minutes."   *Id.*   She has

---

through the clinic at the University of Florida.   *Id.*

[8]   Plaintiff began treatment at the Gainesville Pain Center in January 2012. R. 64.   She was treated for pain management in Tampa prior to this time.   *Id.*

difficulty going up and down stairs.   *Id.*   Plaintiff stated that she had fallen "a lot" because her leg "will just go out."   R. 60.   She sometimes uses a cane.   She stated that her pain management doctor was going to write her a prescription for a "handicapped sticker" at her next appointment.   *Id.*   She has difficulty bending.   She uses a "shower chair."   *Id.*   She has difficulty squatting and kneeling; she is able to do so but in pain. *Id.*   She can lift a pitcher of Kool-Aid at times with her right arm, but not with her left arm. R. 60-61.

Plaintiff stated that she has difficulty concentrating because of her pain; she does things "over and over and over again."   R. 61.   She has panic attacks "[a]ll the time." As a result, she has "[p]ain shooting in [her] chest . . . [she] can't breathe, hyperventilating, break out into a sweat; start crying."   *Id.*; *see* R. 62.   She has problems getting out of the house due to her psychiatric issues, but feels safer now that she lives with her daughter and son-in-law and away from certain population groups. R. 62.

Plaintiff had been seeing Dr. Prowell, her psychiatrist, about once a month from about 2010 until February 2012 and not since because she did not have insurance, although the doctor lets her call her on the telephone and "let her know things ain't going right."   R. 56-57; *see* R. 539 (December 27, 20111, appointment with Dr. Prowell).   Plaintiff takes Abilify, Trazodone, and Celexa. R. 56.   Dr. Prowell has helped her get a three-month supply of her medications through a charity program.   *Id.*

### D.   The Vocational Expert's Testimony

The ALJ asked the vocational expert to assume an individual of Plaintiff's age (46), education (high school), and work background, who is limited to lifting 10 pounds, could not crawl or climb ladders, ropes, or scaffold; and could only occasionally perform reaching overhead and forward with her left arm, but had no restrictions on the use of her right arm.   R. 69.   The ALJ further restricted the individual to no work involving unprotected heights and exposure to machinery and further limited to routine, uncomplicated work tasks that do not involve assembly or working at a fast pace.   *Id.* The vocational expert testified that Plaintiff's former work would be eliminated because of its semi-skilled nature, but that other work existed in the national economy that Plaintiff could perform, including the light, unskilled jobs of ticket taker, office helper, and routing clerk.   R. 70; *see* R. 31.   The ALJ amended the hypothetical question to include a sit/stand option.   *Id.*   The vocational expert identified jobs that could be performed with an option to sit or stand while working.   R. 70-71.

## V.  Legal Analysis

The issue before this Court is whether substantial evidence in the record as a whole supports the Commissioner's final administrative decision that Plaintiff was entitled to a closed period of disability from November 23, 2009, through April 4, 2011, with her disability ending on April 4, 2011, because she had achieved sufficient medical improvement such that she was capable of performing work that exists in significant numbers in the economy after April 5, 2011.

> **Substantial evidence supports the ALJ's determination that Plaintiff was no longer disabled beginning April 5, 2011.**

Plaintiff argues that nothing happened on April 4, 2011, or thereafter that would support a finding that Plaintiff's mental and physical condition substantially improved such that she was no longer disabled.   Doc. 17 at 14.   In support, Plaintiff argues that the only change in Plaintiff's medical status near April 4, 2011, was Dr. Dell's removal of her clavicle plate in February 2011.   Doc. 17 at 19.   Plaintiff also refers to her diagnoses and treatment for chronic pain at the University of Florida and her diagnoses of major depressive disorder, anxiety, paranoid personality disorder to support her continuing disability.   Doc. 17 at 20.

The ALJ determined that Plaintiff was entitled to a closed period of disability from November 23, 2009, her onset date and date of disability, through April 4, 2011.   R. 25. The ALJ also determined that beginning April 5, 2011, Plaintiff's physical and mental condition had improved to such a degree that her RFC had increased and that she was able to perform work in the national economy even though she remained unable to perform past relevant work.   R. 27-31.

The ALJ summarized Plaintiff's debilitating injury she sustained in November 2009 as a result of an automobile accident through and including April 4, 2011.   R. 21-25. Proceeding with the evaluation process, the ALJ assessed Plaintiff's RFC prior to April 4, 2011, and determined that she was off-task as much as one third of the workday due to distracting symptoms of pain.   R. 22, 24.   As a result, the ALJ found that Plaintiff could not perform her past relevant work or any other work that existed in the national economy for the closed-end period.   R. 23-24.

For the period after the April 4, 2011, the ALJ applied the specific sequential

evaluation process used in determining whether a claimant's disability has ceased.

R. 19-20.   The ALJ summarized the evidence relating to Plaintiff's evaluation and

treatment for her physical and mental condition thereafter and in light of her testimony.

R. 25-30.   Plaintiff does not take issue with the ALJ's factual findings, only her ultimate

conclusion.

Contrary to Plaintiff's argument, the record contains substantial evidence that

Plaintiff experienced medical improvement after April 4, 2011.   As noted above, medical

improvement is any decrease in the medical severity of the claimant's impairment(s)

based on changes in the symptoms, signs, and/or laboratory findings associated with the

claimant's impairment(s).   20 C.F.R. § 404.1594(b)(1); 20 C.F.R.

§ 404.1528 (defining symptoms, signs, and laboratory findings).

On April 4, 2011, Plaintiff returned to the orthopedic clinic at the University of

Florida for a follow-up after her hardware removal.   R. 491.   Plaintiff reported that she

was doing "much, much, better."   *Id*.; *see* R. 28.   On examination, Dr. Dell found no

tenderness to palpation along the clavicle, some tenderness about the deltoid, and no

motor or sensory deficits.   *Id*.   Dr. Dell prescribed physical therapy exercises for

shoulder ROM strengthening exercises.   *Id*.   (Plaintiff testified that she did not return to

Dr. Dell after he recommended a 10-pound restriction and referred her for physical

therapy.   R. 64.)   Although Plaintiff complained in March 2012 of "chronic intractable

pain" in her left clavicle and that she was "unable to work" because of a "severe limitation

in her left arm," R. 524, facts noted by the ALJ, R. 29, she did not seek further medical

treatment for her shoulder injury after April 4, 2011.[9]   The March 2012 treatment plan

consisted of increasing in her existing dose of Oxycodone, a prescription for two other

medications, physical therapy, and a follow-up visit in 28 days.   R. 528.   The record

does not indicate that Plaintiff continued with physical therapy to strengthen ROM of her

left shoulder much beyond February 8, 2011, when the hardware was removed, R. 423,

or after her follow-up visit with Dr. Dell on April 4, 2011, R. 491.   (Plaintiff testified that her

physical therapy may have "went longer than a month or two.   Probably -- 2011 --" after

the hardware was removed.).   R. 64-66.   Dr. Rahmani noted reported in a May 18,

2011, patient note that Plaintiff reported attending physical therapy four times a week.   R.

557).

 The ALJ noted that during an annual physical examination on October 12, 2011,

six months after Plaintiff was examined by Dr. Dell, Dr. Nagoshi found that Plaintiff had

normal ROM and no joint swelling or tenderness on examination.   R. 28, 533.   Plaintiff

---

[9]   The ALJ stated:

> [D]eterminations of disability are not within the competence of physicians
> whose conceptions of what constitutes disability are highly varied and
> generally do not coincide with the statutes, regulations, and rulings which
> govern decisions as to disability by the Social Security Administration.
> There is an additional concern that the doctor relied too heavily on the
> claimant's subjective report of her symptoms and limitations, uncritically
> accepting as true most, if not all, of what the claimant reported.   However,
> the medical evidence of record does not contain the type of significant
> clinical and laboratory abnormalities one would expect if the claimant were
> in fact disabled.   For example, on October 2011, the claimant had normal
> range of motion and no joint swelling or tenderness on examination. The
> claimant had normal muscle tone and sensation (Exhibit 27F).   For the
> aforementioned reasons, the undersigned has accorded little weight to the
> opinion from the Gainesville Pain Center.
> R. 29-30.

also had normal muscle tone, sensation, and coordination.   *Id.*   There was no mention

in the examination report of any shoulder pain.   R. 531-34.   These examination findings

support the ALJs finding that Plaintiff had medically improved.   Moreover,

Dr. Nagoshi indicated that Plaintiff's depression and anxiety are well-controlled with

medication and her mood, affect, and behavior were normal.   R. 532-33.

On November 22, 2011, Plaintiff told Dr. Prowell that her sleep was better at night

and that her anxiety was better during the day since the change to Trazodone.   R. 542.

Dr. Prowell noted that Plaintiff's affect was appropriate, engaged, interactive, and

euthymic.   R. 543.   On December 27, 2011, Dr. Prowell noted that Plaintiff stated "her

mood is 'ok,' not depressed, primarily enjoys eating and sleeping, denies SI" and that her

anxiety is improved.   R. 539; *see* R. 29.[10]

Furthermore, Plaintiff's statements regarding her functioning provide substantial

evidence that she experienced medical improvement in her symptoms and signs

associated with her impairments.   *See* 20 C.F.R. § 404.1594(b)(1).   Plaintiff testified

during the hearing on May 7, 2012, that the primary reason she stopped working was her

left arm injury from the 2009 accident, but that she could now lift her arm over her head

and could use it to grab or wash a dish.   R. 53-55.   Plaintiff also testified that she could

sit for 30 to 45 minutes and lift ten pounds with her left arm.   R. 60-61.   Moreover,

Plaintiff told Dr. Rahmani in May and June 2011 that after her house arrest ended on June

13, 2011, she wanted to return to work.   R. 554, 557.

---

[10]   The ALJ noted that Plaintiff "began mental health treatment in April 2011, and the record indicates that medication manages her mental symptomatology (Exhibit 28F)." R. 30; *see* R. 539-64.

Plaintiff did not provide evidence to support her allegations of disabling symptoms after April 5, 2011.   The ALJ properly considered the relevant evidence and properly performed her duty as the trier of fact to weigh and resolve any conflicts in the evidence. Plaintiff did not prove that she could not perform a modified range of light work as of April 5, 2011, and she further did not prove she could not perform the jobs cited by the vocational expert and the ALJ.   Substantial evidence supports the ALJ's findings and her conclusion that Plaintiff was not disabled as of April 5, 2011.

## VI. Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly followed the law.   Accordingly, pursuant to 42 U.S.C § 405(g), it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits beginning April 5, 2011, be **AFFIRMED** and the Clerk directed to enter judgment for the Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on August 5, 2014.

s/   Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.   A party may respond to another party's objections within 14 days after being served with a copy thereof.   Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**